## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

|  |  |
|---|---|
| Lynk Labs, Inc., | |
| Plaintiff, | Case No. 6:21-cv-00097-ADA |
| v. | **JURY TRIAL DEMANDED** |
| Home Depot USA, Inc., The Home Depot Inc., and Home Depot Product Authority, LLC, | |
| Defendants. | |

## DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF ON THE TERMS OF U.S. PATENT NOS. 10,091,842, 10,154,551, 10,349,479, 10,492,251, 10,517,149, 10,537,001, 10,652,979, 10,757,783, AND 10,932,341

# TABLE OF CONTENTS

**Page**

I.      Introduction ........................................................................................................... 1

II.     The Agreed Terms ............................................................................................... 1

III.    Level of Ordinary Skill in the Art ...................................................................... 2

IV.     The Disputed Terms ............................................................................................ 2

       A.     "Driver" ('551 patent (claims 1, 3, 4, 5), '001 patent (claims 1, 6, 11, 16), '842 patent (claims 33, 38, 43), '979 patent (claims 7, 13), '149 patent (claims 1, 5, 11)) .................................................................................. 2

       B.     "Reflective substrate" ('551 patent (claims 1, 3, 4, 5), '251 patent (claims 1, 13)) and "reflective material" ('149 patent (claim 1)) ....................................... 4

       C.     "Heat sinking material" ('551 patent (claim 4)) "a heat sink" ('001 patent (claim 16)) "heat sinking… material" ('149 patent (claim 1)) ............................. 5

       D.     "Insulating substrate" ('979 patent (claim 7), '149 patent (claim 11), '001 patent (claim 6)) ........................................................................................... 6

       E.     "Package" ('979 patent (claim 13), '149 patent (claims 1), '001 patent (claim 11)) ............................................................................................................ 9

       F.     "Switch" ('783 patent (claims 1, 4, 8, 11, 16), '341 patent (claims 1, 8), '001 patent (claims 1, 6, 11, 15, 16), '479 patent (claims 9, 11, 15) ................. 10

       G.     "Enable User Selection" Terms ............................................................... 14

       H.     "The switch is connected between the AC voltage power source and the LED lighting device" ('341 patent (claim 4)) ...................................................... 19

       I.     "Forward voltage" '001 patent (claims 1, 6, 11, 16), "forward voltages" '341 Patent (Claim 3) ................................................................................................ 20

       J.     "An LED circuit comprising two or more LEDs connected together in series to match a forward voltage drop of the mains AC power source" ('979 patent (claim 7)) ....................................................................................... 23

       K.     "Either a rectified DC voltage Or a Rectified AC Voltage and wherein the second frequency of the output is a relatively higher frequency than the first frequency of the input" ('842 patent (claims 33, 38)) and "rectified AC voltage" ('551 patent (claims 1, 3, 4, 5)) ...................................................... 26

i

**TABLE OF CONTENTS**
**(Continued)**

**Page**

L.    "To dim the first LED circuit or the at least one additional LED circuit
regardless of a user's selection via the switch" ('001 patent (claim 15)) ............ 28

V.    Conclusion ................................................................................................................. 29

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*1 Energy Sols., Inc. v. Nicholas Holiday, Inc.*,
    No. CV13-5000-MWF (EX), 2014 WL 12589113 (C.D. Cal. July 9, 2014) ..........................21

*AFG Indus., Inc. v. Cardinal IG Co.*,
    239 F.3d 1239 (Fed. Cir. 2001)........................................................................................3, 6

*Bicon, Inc. v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006)...............................................................................................25

*Cao Group Inc. v. Magpie Tech Corp.*,
    No. 2:15CV697DAK (D. Utah 2017) ......................................................................................6

*CAO Lighting, Inc. v. Feit Electric Company, Inc.*,
    No. CV 20-04926-AB (PJW) (C.D. Cal. 2021) ......................................................................6

*Chervon (HK) Ltd. v. One World Techs., Inc.*,
    No. CV 19-1293-LPS, 2020 WL 6561229 (D. Del. Nov. 9, 2020) ........................................10

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
    527 F.3d 1379 (Fed. Cir. 2008).............................................................................................5

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
    755 F.3d 1367 (Fed. Cir. 2014)........................................................................................9, 21

*Intel Corp. v. Qualcomm Inc.*,
    IPR2018-01429, Paper 43 (PTAB Jan. 30, 2020)................................................................11

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
    327 F.3d 1364 (Fed. Cir. 2003).......................................................................................11, 14

*IQASR LLC v. Wendt Corp.*,
    825 F. App'x 900 (Fed. Cir. 2020) ......................................................................................27

*Koki Holdings Co. v. Kyocera Senco Indus. Tools, Inc.*,
    No. CV 18-313-CFC, 2021 WL 1092579 (D. Del. Mar. 22, 2021)................................ *passim*

*Kothmann & Kothmann v. Trinity Indus., Inc.*,
    287 F. Supp. 2d 673 (S.D. Tex. 2003) ..................................................................................4

*Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*,
    No. CIV.A. 03-927-GMS, 2005 WL 6220493 (D. Del. Apr. 7, 2005)....................................10

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Magna Electronics, Inc. v. TRW Automotive Holdings Corp. et al.*,
  No. 1:12-cv-654, No. 1:13-cv-324 (W.D. Mich. 2015) ................................................6

*Mantissa Corp. v. Ondot Sys., Inc.*,
  No. 4:15-CV-1133, 2017 WL 1373771 (S.D. Tex. Jan. 13, 2017), *report and
  recommendation adopted*, No. 4:15-CV-01133, 2017 WL 1383884 (S.D. Tex.
  Apr. 13, 2017) .......................................................................................................3, 6

*Mynette Techs., Inc. v. United States*,
  139 Fed. Cl. 336 (2018) ...........................................................................................11

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014) ................................................................................20, 23, 27

*Neutral Tandem, Inc. v. Peerless Network, LLC*,
  No. 08 C 3402, 2010 WL 446086 (N.D. Ill. Feb. 8, 2010) ......................................10

*Oatey Co. v. IPS Corp.*,
  514 F.3d 1271 (Fed. Cir. 2008) ..........................................................................11, 14

*ParkerVision, Inc. v. Intel Corp.*,
  No. 6-20-cv-00562 (W.D. Tex. July 23, 2021), ECF No. 61 (J. Albright) ..............10

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
  815 F.3d 747 (Fed. Cir. 2016) ..................................................................................26

*Stone Basket Innovations LLC v. Cook Med. LLC*,
  No. 2:15-CV-464-JRG-RSP, 2016 WL 1182926 (E.D. Tex. Mar. 28, 2016) ............4

*Thorner v. Sony Computer Ent. Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ............................................................................9, 21

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
  503 F.3d 1295 (Fed. Cir. 2007) ................................................................................11

*Welch Allyn, Inc. v. OBP Corp.*,
  No. 5:14-CV-1122, 2016 WL 3387272 (N.D.N.Y. June 17, 2016) ..........................10

**Statutes**

35 U.S.C. § 112 ..............................................................................................19, 22, 28, 29

35 U.S.C. § 132 ......................................................................................................22, 29

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

**Other Authorities**

*IEEE 100 The Authoritative Dictionary of IEEE Standards Terms* (7th Ed., 2000) .....................27

**TABLE OF EXHIBITS**

| EXHIBIT | DESCRIPTION | BATES Range |
|---|---|---|
| 1 | U.S. Patent No. 10,757,783 ("'783 Patent") | HD_LYNK_00014444-66 |
| 2 | U.S. Patent No. 10,537,001 ("'001 Patent") | HD_LYNK_00013552-68 |
| 3 | U.S. Patent No. 10,932,341 ("'341 Patent") | HD_LYNK_00014368-85 |
| 4 | U.S. Patent No. 10,349,479 ("'479 Patent") | HD_LYNK_00014386-HD_LYNK_00014405 |
| 5 | U.S. Patent No. 10,517,149 ("'149 Patent") | HD_LYNK_00014261-HD_LYNK_00014307 |
| 6 | U.S. Patent No. 10,652,979 ("'979 Patent") | HD_LYNK_00014504-40 |
| 7 | U.S. Patent No. 10,154,551 ("'551 Patent") | HD_LYNK_00014406-43 |
| 8 | U.S. Patent No. 10,492,251 ("'251 Patent") | HD_LYNK_00014308-67 |
| 9 | U.S. Patent No. 10,091,842 ("'842 Patent") | HD_LYNK_00014467-HD_LYNK_00014503 |
| 10 | "Driver" Definition in IEEE 100 The Authoritative Dictionary of IEEE Standards Terms (7th Ed., 2000) | HD_LYNK_00011442-44 |
| 11 | "Reflective" Definition in the Cambridge English Dictionary | LYNK_HD_00005199-5205 |
| 12 | "Heat Sink" Definition in Merriam-Webster Dictionary | LYNK_HD_00005206-12 |
| 13 | "Insulator" Entry in Britannica Online Encyclopedia | LYNK_HD_00005194-95 |
| 14 | Excerpts from IEEE 100 The Authoritative Dictionary of IEEE Standards Terms (7th Ed., 2000) | LYNK_HD_00005213-19 |
| 15 | Excerpt from File History of Patent App. No. 13/697,646 | HD_LYNK_00013569 at HD_LYNK_00013717-23 |
| 16 | '001 Patent Prosecution History Patent Owner's Amendments and Arguments/Remarks on June 13, 2019 | LYNK_HD_00002434 at LYNK_HD_00002774-83 |
| 17 | '479 Patent Prosecution History Patent Owner's Amendments and Arguments/Remarks on June 13, 2018 | LYNK_HD_00000850 at LYNK_HD_00001295-LYNK_HD_00001304 |
| 18 | U.S. Patent Publication No. 2012/0081009 ("Shteynberg") | HD_LYNK_00014541-HD_LYNK_00014630 |
| 19 | '783 Patent Prosecution History Original Claims Filed on June 13, 2019 | LYNK_HD_00003106 at LYNK_HD_00003127-62 |

**TABLE OF EXHIBITS**
**(Continued)**

| 20 | U.S. Patent No. 6,781,329 ("Mueller") | HD_LYNK_00014631-74 |
|----|----------------------------------------|---------------------|
| 21 | U.S. Patent No. 8,710,754 ("Baddela") | HD_LYNK_00014675-89 |
| 22 | '341 Patent Prosecution History Patent Owner's Amendments on September 29, 2020 | LYNK_HD_00003447 at LYNK_HD_00003991-97 |
| 23 | "Match" Definition in IEEE 100 The Authoritative Dictionary of IEEE Standards Terms (7th Ed., 2000) | HD_LYNK_00013548-51 |
| 24 | '479 Patent Prosecution History Final Rejection by Examiner on April 30, 2019 | LYNK_HD_00000850 at LYNK_HD_00001388-98 |
| 25 | '783 Patent Prosecution History Examiner's Non-Final Rejection on July 23, 2019 | LYNK_HD_00003106 at LYNK_HD_00003182-91 |
| 26 | '783 Patent Prosecution History Patent Owner's Amendments and Arguments/Remarks on August 22, 2019 | LYNK_HD_00003106 at LYNK_HD_00003238-48 |
| 27 | '783 Patent Prosecution History Patent Owner's Amendments and Arguments/Remarks on June 16, 2020 | LYNK_HD_00003106 at LYNK_HD_00003392- LYNK_HD_00003400 |
| 28 | '479 Patent Prosecution History Examiner's Non-Final Rejection on October 2, 2018 | LYNK_HD_00000850 at LYNK_HD_00001324-34 |
| 29 | '479 Patent Prosecution History Patent Owner's Amendments and Arguments/Remarks on April 2, 2019 | LYNK_HD_00000850 at LYNK_HD_00001349-61 |
| 30 | '479 Patent Prosecution History Patent Owner's Amendments and Arguments/Remarks on May 2, 2019 | LYNK_HD_00000850 at LYNK_HD_00001426-29 |

## I.    INTRODUCTION

Defendants Home Depot USA, Inc., The Home Depot Inc., and Home Depot Product Authority, LLC (collectively, "Home Depot" or "HD")[1] submit this brief in support of their proposed constructions of the disputed claim terms from the nine patents in suit.  HD's proposed constructions are faithful to the claims' language, the teachings of the patents' specifications, the patents' prosecution histories, and the applicable case law.  Lynk Labs' proposed constructions are at odds with the plain language of the claims, the teachings of the specifications, and well-established principles of claim construction.

## II.    THE AGREED TERMS

The parties agree that the preambles in the asserted claims of the '783, '001, '341 and '479 patents are limiting.

The parties agree that "DC-DC converter" means "device that converts a source of direct current from one voltage level to another (e.g., buck-boost, boost, buck, flyback)."

The parties agree that the following terms all mean "ac power source at a location or facility":

- "**mains power source**" ('001 patent (claims 15, 16), '551 patent (claim 1, 3, 4), '251 patent (claim 13), '149 patent (claims 1, 5))
- "**AC mains voltage source**" (('783 patent (claims 1, 4))
- "**mains AC voltage power source**" ('979 patent (claims 7, 13))
- "**mains AC power source**" ('979 patent (claim 7)))
- "**mains voltage power source**" ('979 patent (claim 13))

---

[1]  The Home Depot, Inc. is an improperly named holding company; it does not manufacture, use, sell, or offer for sale any device accused of infringement in this case, nor does it operate Home Depot's retail stores or online presence. Those activities are performed solely by Defendants Home Depot U.S.A., Inc. and Home Depot Product Authority, LLC. Accordingly, The Home Depot, Inc. should be dismissed from this case.

## III.  LEVEL OF ORDINARY SKILL IN THE ART

A person of ordinary skill in the art ("POSITA") for the asserted patents would have had at least a bachelor's degree in electrical engineering, or similar technical field, with two years of relevant experience in the field of design and/or development of LEDs and circuits in the context of lighting control systems.  An increase in experience could compensate for less education. This level of skill would apply from the earliest filed priority application to the most recently filed application.  Neikirk Decl. at ¶¶ 28-32.

## IV.  THE DISPUTED TERMS

### A.  "Driver" ('551 patent (claims 1, 3, 4, 5), '001 patent (claims 1, 6, 11, 16), '842 patent (claims 33, 38, 43), '979 patent (claims 7, 13), '149 patent (claims 1, 5, 11))

| Home Depot's Proposed Construction | Lynk's Proposed Construction |
|---|---|
| "driver" means "circuitry that supplies an input to another circuit" | Plain and ordinary meaning |

The term "driver" is a term-of-art to a POSITA meaning "circuitry that supplies an input to another circuit."  For example, the IEEE technical dictionary from 2000 defines "driver" as "[a]n electronic circuit that supplies input to another electronic circuit. . . . a program, circuit or device used to power or control other programs, circuits or devices."  Ex. 10, HD_LYNK_00011442-44; Neikirk Decl. at ¶ 34.  This is consistent with its usage in the patents. *Id.* There is no lexicography, disclaimer or any other basis in the intrinsic record that justifies changing or narrowing the meaning of this term.

Home Depot understands that Lynk's primary concern with Home Depot's construction is its breadth.  But the ordinary meaning of driver is broad, and the claims provide additional limitations that narrow particular aspects of the claimed "driver."  For example, claim 33 of the '842 patent defines the input of the driver as follows:

> an input of a first voltage and a first frequency, wherein the first voltage is an AC voltage.

Ex. 9, '842 patent at 21:4-6.  Claim 33 defines the output of the driver as follows:

> an output of a second voltage and a second frequency to the at least one LED circuit, wherein the second voltage is either a rectified DC voltage or a rectified AC voltage and wherein the second frequency of the output is a relatively higher frequency than the first frequency of the input.

*Id.* at 21:9-14.  And claim 33 defines what the driver drives as follows:

> an LED circuit driver connected to at least one LED circuit . . . the plurality of different LED circuits capable of being connected to the output of the LED circuit driver in parallel one LED circuit at a time.

*Id.* at 21:7-19.  Thus, the surrounding claim language provides any appropriate narrowing limitations, and the term "driver" itself should be given the full breadth of its meaning in the art.

Additionally, a jury will understand that "driver" has many other meanings outside of the relevant field, but will not understand that the term "driver" has a specific technical meaning in the field, further necessitating Home Depot's construction over Lynk's proposed "plain & ordinary meaning." *See AFG Indus., Inc. v. Cardinal IG Co*., 239 F.3d 1239, 1247 (Fed. Cir. 2001) ("It is critical for trial courts to set forth an express construction of the material claim terms in dispute, in part because the claim construction becomes the basis of the jury instructions . . . .") (citation omitted); *Mantissa Corp. v. Ondot Sys., Inc*., No. 4:15-CV-1133, 2017 WL 1373771, at *5 (S.D. Tex. Jan. 13, 2017), *report and recommendation adopted*, No. 4:15-CV-01133, 2017 WL 1383884 (S.D. Tex. Apr. 13, 2017) ("To the contrary, the Court finds that adopting the proposed construction will further a key purpose of claim construction: making the claim term understandable to a jury of laypersons.") (citations omitted).  Thus, the term "driver" should be provided its known meaning in the art of "circuitry that supplies an input to another circuit."

**B.    "Reflective substrate" ('551 patent (claims 1, 3, 4, 5), '251 patent (claims 1, 13)) and "reflective material" ('149 patent (claim 1))**

| Home Depot's Proposed Construction | Lynk's Proposed Construction |
|---|---|
| "reflective substrate" means "substrate that reflects some light"  "reflective material" means "material that reflects some light" | Plain & ordinary meaning |

The parties dispute whether the ordinary meaning of "reflective" requires any minimum amount of reflectivity.  Home Depot's proposed construction comports with the ordinary meaning requiring only the reflection of some light, without reading in any unclaimed minimum amount of reflectivity.  A construction is necessary because there are several potential meanings of "reflective," including the requirement of a "mirror-like" amount of reflection, or where "most" (i.e., 51%) of the light is reflected, or where just some of the light is reflected.  *See* Ex. 11, LYNK_HD_00005202 ("The mirror substrate is nearly 2 inches (5 centimeters) thick with a highly-polished *reflective* front and a whiffled textured back."), LYNK_HD_00005199 ("reflective (SURFACE)" reading "[a] reflective surface sends back most of the light that shines on it and can therefore be seen easily"), LYNK_HD_00005201 ("reflective (SENDING BACK)" reading "able to send back light, hear [sic], energy, or sound from a surface.").  Given that some meanings of "reflective" include a minimum amount of reflectivity, and given that the parties dispute the applicable ordinary meaning, the Court should construe this term to make clear that the relevant ordinary meaning does not include a minimum amount of reflectivity.  *See Kothmann & Kothmann v. Trinity Indus., Inc.*, 287 F. Supp. 2d 673, 683 (S.D. Tex. 2003) ("If a claim term has multiple meanings, the court must interpret the term to encompass all consistent meanings, based on the intrinsic evidence.") (citation omitted); *Stone Basket Innovations LLC v. Cook Med. LLC*, No. 2:15-CV-464-JRG-RSP, 2016 WL 1182926, at *7 (E.D. Tex. Mar. 28,

2016) (citing *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) ("[O]ur court has cautioned against interpreting a claim term in a way that excludes disclosed embodiments, when that term has multiple ordinary meanings consistent with the intrinsic record.")).

The specifications of the patents comport with the ordinary meaning as proposed by Home Depot by including examples of a "mirror like reflective material" and examples that are not as reflective. Ex. 5, '149 patent at 5:30-31 ("a reflective material"), 17:41-52 ("a reflective device"), 22:57-64 ("a mirror like reflective material"). And the specifications of all the patents are silent on the precise term "reflective substrate." *See, e.g.*, Ex. 7, '551 patent (no use of "reflective substrate" outside of Abstract and claims); Ex. 8, '251 patent (no use of "reflective substrate" outside claims). The Court should resolve this claim construction dispute and make clear to the jury that the relevant ordinary meaning of "reflective" merely requires the reflection of some light.

C.     **"Heat sinking material" ('551 patent (claim 4)) "a heat sink" ('001 patent (claim 16)) "heat sinking… material" ('149 patent (claim 1))**

| Home Depot's Proposed Construction | Lynk's Proposed Construction |
|---|---|
| "heat sinking material" / "heat sink" / "heating sinking… material" means "material that conducts some heat" | Plain & ordinary meaning |

The parties dispute whether the ordinary meaning of these terms requires a minimum amount of heat transfer. Home Depot's proposed construction correctly reflects the ordinary meaning of these terms requiring only that they conduct some heat, without reading in any unclaimed minimum amount of heat transfer. *See, e.g.,* Ex. 12, LYNK_HD_00005206 (Merriam-Webster definition of "heat sink" reading "a substance or device that absorbs or dissipates especially unwanted heat (as from a process or an electronic device)."); Memorandum

Decision and Order, *Cao Group Inc. v. Magpie Tech Corp.*, No. 2:15CV697DAK at 12 (D. Utah 2017) ("heat sink": "body that draws heat away from an LED"); Claim Construction Order, *CAO Lighting, Inc. v. Feit Electric Company, Inc.*,  No. CV 20-04926-AB (PJW) at 13 (C.D. Cal. 2021) ("heat sink": "a substance or device that absorbs or draws heat from another object"); Opinion and Order Regarding Claim Construction, *Magna Electronics, Inc. v. TRW Automotive Holdings Corp. et al.*, No. 1:12-cv-654, No. 1:13-cv-324 at 4 (W.D. Mich. 2015) ("Heat sink: Element that absorbs heat").  The intrinsic record is consistent with that ordinary meaning and does not require any minimum degree of heat transfer.  *See, e.g.*, Ex. 7, '551 patent at 5:28-29, 16:61-17:1, 17:31-34, claims 4, 8, 15, 20.

Additionally, a jury will not understand the terms "heat sinking material" or "heat sink" due to their technical nature, further necessitating Home Depot's construction over Lynk's proposed "plain & ordinary meaning." *See AFG Indus., Inc.*, 239 F.3d at 1247 ("It is critical for trial courts to set forth an express construction of the material claim terms in dispute, in part because the claim construction becomes the basis of the jury instructions . . . .") (citation omitted); *Mantissa Corp.*, No. 4:15-CV-1133, 2017 WL 1373771, at *5, *report and recommendation adopted*, 2017 WL 1383884 ("To the contrary, the Court finds that adopting the proposed construction will further a key purpose of claim construction: making the claim term understandable to a jury of laypersons.") (citations omitted).

### D.     "Insulating substrate" ('979 patent (claim 7), '149 patent (claim 11), '001 patent (claim 6))

| Home Depot's Proposed Construction | Lynk's Proposed Construction |
| --- | --- |
| "insulating substrate" means "a substrate that provides some electrical insulation" | Plain & ordinary meaning |

The parties dispute whether "insulating substrate" is limited to "electrical" insulation and whether the ordinary meaning of this term requires any minimum amount of insulation.  Home

Depot's proposed construction correctly reflects that the term only requires some amount of electrical insultation, without reading in any unclaimed minimum.

First, this term is properly limited to *electrical* insulation in-line with the claims and intrinsic evidence.  In addition to insulating substrates, the patents describe and claim substrates that include heat sinks to remove heat that a POSITA knows is generated by and can damage LEDs.  Ex. 6, '979 patent at 7:44-54; Ex. 5, '149 patent at 5:30-42, 17:15-40; 17:53-18:4, claims 1, 19; Ex. 2, '001 patent at 6:65-7:11, 7:66-8:10, claims 12, 16.  It would make no sense in the context of the patents for a substrate to intentionally be thermally insulating, which outside of the context of the patents would be an ordinary meaning of insulating.  *See* Ex. 13, LYNK_HD_00005194-95 ("Insulator, any of various substances that block or retard the flow of electrical or thermal currents."); *see, e.g.,* Ex. 2, '001 patent at 2:9-35 (prior art U.S. Pat. No. 7,525,248 having an "electrically insulative . . . substrate[]"), 2:36-56 (prior art U.S. Pat. No. 7,213,942 described as "[t]he electrical insulation between small LEDs within a single-chip is achieved by etching light emitting materials into the insulating substrate . . . ").  A thermally insulating substrate would directly contribute to a known problem in the field of art, thermal runaway (*i.e.*, the overheating and resulting failure of LED circuits).  The materials that the '001 and '149 patent specifications list as "insulators" are electrical insulators typically used to make circuit boards.  *See* Ex. 2, '001 patent at 7:55-65 ("Preferred embodiments of a package may include an insulating substrate whereon the LEDs, capacitors and or resistors are formed or mounted. . . . The substrate may be such as sapphire, silicon carbide, gallium nitride, ceramics, printed circuit board material, or other materials for hosting circuit components."), claim 7 ("the insulating substrate comprises sapphire"); Ex. 5, '149 patent at 5:17-29 (same), 8:26-29 ("[w]hen desired, the LED circuit with capacitor may be placed on an insulating substrates [sic] such as

but not necessarily ceramic or sapphire"). The patents do not refer to materials known for their thermal insulating qualities as insulating. *See, e.g.,* Ex. 13, LYNK_HD_0005195 ("[t]hermal insulating materials include fiberglass, cork, and rock wool"). And the '979 patent uses "insulating" in the context of electrical insulation when describing prior art references. Ex. 6, '979 patent at 2:15-61. Neikirk Decl. at ¶ 36. Thus, the claimed insulation should be construed as "electrical" in light of the intrinsic record of the '979, '149, and '001 patents.

Second, and independent of whether this term is limited to "electrical" insulation, the ordinary meaning of this term only requires some amount of insulation. Neikirk Decl. at ¶ 35. For example, the ordinary meaning merely requires that the material "retard" the flow of electric currents or be a "poor conductor" or have a "high resistance."

> Insulator, any of various substances that block or retard the flow of electrical . . . currents. . . . Although an electrical insulator is ordinarily thought of as a nonconducting material, it is in fact better described as a poor conductor or a substance of high resistance to the flow of electric current. Different insulating and conducting materials are compared with each other in this regard by means of a material constant known as resistivity. . . . In the microscopic structures of integrated circuits, insulating materials such as silicon nitride may be employed in thicknesses as small as a micron.

Ex. 13, LYNK_HD_0005194 (Britannica Online Encyclopedia). Thus, *some* electrical insulation must be present in the insulator (*i.e.*, the insulating substrate), but there is no minimum amount of insulation required. This construction aligns with all of the materials listed in the specifications of the '001 and '149 patents. *See* Ex. 2, '001 patent at 7:55-65, claim 7; Ex. 5, '149 patent at 5:17-29, 8:26-29. Neikirk Decl. at ¶ 36.

E.   **"Package" ('979 patent (claim 13), '149 patent (claims 1), '001 patent (claim 11))**

| Home Depot's Proposed Construction | Lynk's Proposed Construction |
|---|---|
| "package" means "an integrated unit meant to be used as a discrete component in either of the manufacture, assembly, installation, or modification of an LED lighting device or system" | Plain & ordinary meaning |

"Package" is expressly defined in the intrinsic record as follows:

> It should be noted that **"package"** or "packaged" **is defined herein as** an integrated unit meant to be used as a discrete component in either of the manufacture, assembly, installation, or modification of an LED lighting device or system.

Ex. 2, '001 patent at 7:46-50 (emphasis added); Ex. 5, '149 patent at 5:8-12.  The '979 Patent, which is in the same patent family as the '001 patent, expressly incorporates by reference U.S. patent application No. 13/697,646, which contains the same definition of "package."  Ex. 15, HD_LYNK_00013719 (defining "package" in the same way); Ex. 6, '979 patent at 1:12-13, 40-42.  This term should be construed according to that express definition.  *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) ("To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning" and must "clearly express an intent to redefine the term."). (quoting *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)).

Additionally, Home Depot's proposed construction, which includes a "component" (e.g., light bulb) of a "system," is consistent with patentee's statements during prosecution of the '001 patent, wherein the applicant stated that "a light bulb" was an example of "an LED package." Ex. 16, LYNK_HD_00002781 ("'integrated within or onto an LED package' (*e.g.,* a light bulb).").

9

**F.    "Switch" ('783 patent (claims 1, 4, 8, 11, 16), '341 patent (claims 1, 8), '001 patent (claims 1, 6, 11, 15, 16), '479 patent (claims 9, 11, 15)**

| Home Depot's Proposed Construction | Lynk's Proposed Construction |
|---|---|
| "switch" means "plain and ordinary meaning, *i.e.*, an electronic or physical device for opening and closing a circuit" | "switch" means "a device having at least two or more electrical contacts physically configurable by an end user for changing the device from one contact position to another for the purpose of changing a measurable quantity of light output from an LED circuit" |

The parties dispute whether "switch" should be construed to read in limitations like "physically configurable by an end user." Nothing in the specification or file history supports deviating from the plain and ordinary meaning of "switch" in the art, which is "an electronic or physical device for opening and closing a circuit." *See, e.g.,* Claim Construction Order, *ParkerVision, Inc. v. Intel Corp.*, No. 6-20-cv-00562 (W.D. Tex. July 23, 2021), ECF No. 61 (J. Albright) (construing "switch" to have "plain-and-ordinary meaning wherein the plain-and-ordinary meaning is "an electronic device for opening and closing a circuit as dictated by an independent control input"); *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, No. CIV.A. 03-927-GMS, 2005 WL 6220493, at *1 (D. Del. Apr. 7, 2005) (construing "switch" as "a device for making, breaking, or changing the connections in an electrical circuit"); *Neutral Tandem, Inc. v. Peerless Network, LLC*, No. 08 C 3402, 2010 WL 446086, at *4 (N.D. Ill. Feb. 8, 2010) (construing "switch" as "a device, including mechanical, electrical, electronic or optical devices, which opens or closes circuits, completes or breaks a path, or selects paths or circuits"); *Welch Allyn, Inc. v. OBP Corp.*, No. 5:14-CV-1122, 2016 WL 3387272, at *1 (N.D.N.Y. June 17, 2016) (construing "switch" as "a lever, plug, or other device for making or breaking contact, or altering the connections of a circuit"); *Chervon (HK) Ltd. v. One World Techs., Inc.*, No. CV 19-1293-LPS, 2020 WL 6561229, at *6 (D. Del. Nov. 9, 2020) (construing "switch" as "a device for

making, breaking, or changing one or more connections in an electrical circuit"); *Intel Corp. v. Qualcomm Inc.*, IPR2018-01429, Paper 43 at 14 (PTAB Jan. 30, 2020) (construing "switch" as "a device that opens, closes, or changes the connection of a circuit"); *cf. Mynette Techs., Inc. v. United States*, 139 Fed. Cl. 336, 349 n.15 (2018) (acknowledging parties' agreed construction of "switch" to mean "[a] control device that makes or breaks an electrical connection in a circuit"). Lynk improperly proposes that the Court read several limitations into "switch," including that it be "physically" configurable by an "end user."

The specifications of the asserted patents explicitly confirm that a "switch" can be "any" type of switch known in the art. *See, e.g.,* Ex. 4, '479 Patent at Fig. 8, 14:4-34 ("The dimmer switch may be any known in the art, like for example, a phase dimmer switch."); *accord* claim 3 ("wherein the switch is a dimmer switch"). And the specifications expressly state that the switches can have "integrated circuitry" for performing their functions. *See, e.g.,* Ex. 3, '341 Patent at 9:17-24 (disclosing a switch that "may have integrated circuitry that allows for adjustability of the otherwise relatively fixed voltage and/or relatively fixed frequency output of the LED circuit driver."). These disclosed embodiments confirm the breadth of "switch" and it would be improper to construe "switch" to exclude them. *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification.") (citing *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) (rejecting proposed claim interpretation that would exclude disclosed examples in the specification); *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1369 (Fed. Cir. 2003) (finding district court's claim construction erroneously excluded an embodiment described in an example in the specification, where the prosecution history showed no such disavowal of claim scope)).

The prosecution history similarly confirms that "switch" is entitled to its full breadth, including electronic switches.  During prosecution of the '479 patent, the Examiner found that transistors 110 in Shteynberg (U.S. Patent Publication No. 2012/0081009) comprised "switches," and the applicant admitted that switches could "take the form of MOSFET switches, transistors, and other such types of switches that are controlled by [a] controller."  Ex. 17, LYNK_HD_00001303 (applicant admitting that Shteynberg's "switches 110" are "switches").



FIG. 1

Ex. 18, HD_LYNK_00014542, at Fig. 1 (switches 110 annotated).

Similarly, during prosecution of the '783 patent, claim 1 originally recited "a switch that is controlled by an end user."  Ex. 19, LYNK_HD_00003159.  The Examiner rejected the claim as obvious over Chapman (U.S. Patent Publication No. 2011/0183368) because "inherently there is a light controller control[led] by a user."  Ex. 25, LYNK_HD_00003186-87.  In an attempt to distinguish Chapman, the applicant amended claim 1 to require a "physical switch integrated in a package . . ., the physical switch being that is controlled by an end user."  Ex. 26, LYNK_HD_00003239 (underlining and strikeouts in original showing amendment), LYNK_HD_00003245-47.  The applicant argued that this amendment distinguished Chapman

12

because Chapman used a processor to control the light and there was no disclosure that the processor was controlled by a <u>physical switch</u> controlled by an <u>end user</u>. *Id.* at LYNK_HD_00003246 (further distinguishing Chapman by arguing that a POSITA would understand that there are "many ways to program a processor without the use of a physical switch controlled by an end user"). However, the applicant subsequently broadened the claims to remove the "physical switch" and "end user" requirements from the limitation. Ex. 27, LYNK_HD_00003393-96. Thus, no asserted claim in the '783 patent, or any other asserted patent, is limited to a "physical switch" or an "end user."

The Court should reject Lynk's attempt to read various limitations into "switch." Lynk's proposed construction is not the ordinary meaning of "switch," as shown by the evidence cited above and Lynk's failure to disclose any extrinsic evidence supporting its construction. And nothing in the intrinsic record requires that the switch have "two or more electrical contacts physically configurable by an end user for changing the device from one contact position to another" as proposed by Lynk. In fact, the prosecution history discussed above confirms that the Court should reject Lynk's attempt to read in unclaimed limitations.

As noted above, the applicant broadened the claims during prosecution of the '783 patent by deleting the reference to a "physical" switch and "end user." As issued, "end user" appears in only claim 2 of the '479 patent, which is not asserted. Ex. 4, '479 patent at 19:38-40 ("a switch configured to be controlled by an end user"). And the phrase "end user" does not appear at all in the '341 and '001 patents. Instead, both patents expressly contemplate a switch for use by the manufacturer or assembler. Ex. 2-3, '001 and '341 patents, Abstract ("selected by the LED package user, the PCB assembly facility, or the end product manufacturer"), 3:28-31 (explaining that "the voltage level or brightness level" can be "selected at [sic] the LED package user or the

PCB package user, or the PCB assembly facility, or the end product manufacturer"), 3:32-40 (explaining "means of selecting a forward voltage when packaging a multi-voltage and/or multi-brightness circuit") (emphasis added).  Those patents discuss the invention's benefits from the LED packager and the assembler's perspectives, not an end user's.  *See id.* at 3:52-60 ("improves buying power and inventory control for the LED packager").  It would be inappropriate to construe "switch" narrowly to exclude the only disclosed embodiments in those patents.  *Oatey Co.*, 514 F.3d at 1276; *Invitrogen Corp.*, 327 F.3d at 1369.

Finally, nothing in the intrinsic record requires the switch be "for the purpose of changing a measurable quantity of light output from an LED circuit" as proposed by Lynk.  The claims separately recite the function performed by the claimed switch, which varies by claim.  It would be improper and confusing to read another "purpose" into the term "switch" itself.

Accordingly, the Court should adopt Home Depot's proposed construction.

### G.    "Enable User Selection" Terms

| Term | Home Depot's Proposed Constructions | Lynk's Proposed Constructions |
|---|---|---|
| **"enable user selection"** '783 patent (claims 1, 4, 8, 11, 16)  **"selectable by a user switching the switch"** '341 patent (claims 1, 8) '001 patent (claim 16)  **"selectable by a user"** '001 patent (claim 1, 6)  **"switching of the switch is selectable by a user"** '001 patent (claim 11)  **"configured to be controlled by a user"** | "enable user selection" means "enable a user to directly or indirectly select"  "selectable by a user switching the switch" means "selectable by a user directly or indirectly switching the switch"  "selectable by a user" means "selectable by a user directly or indirectly"  "switching of the switch is selectable by a user" means "switching of the switch is | "enable user selection" means "enable a user to directly select"  "selectable by a user switching the switch" means "selectable by a user directly switching the switch"  "selectable by a user" means "selectable by a user directly"  "switching of the switch is selectable by a user" means "switching of the switch is directly selectable by a user" |

| '479 patent (claim 9) | directly or indirectly selectable by a user"<br><br>"configured to be controlled by a user" means "configured to be controlled directly or indirectly by a user" | "configured to be controlled by a user" means "configured to be controlled directly by a user" |
| --- | --- | --- |

The parties dispute whether these phrases require the user to "directly" select, switch, or control the claimed functionality.  The plain and ordinary language of these claims is not limited to "directly" performing these functionalities.  The plain language of the claims merely requires that the user be able to "select" or "switch" or "control" a certain characteristic of an LED circuit such as "brightness," "on or off," "voltage level input," or "color temperature."  Thus, the plain language of the claims does not require that the user "directly" do so, and it would be improper for the Court to read in such a limitation.  Home Depot's construction comports with the plain and ordinary meaning of these phrases and resolves the parties' claim construction dispute by making clear that the claimed functions can be performed "directly or indirectly."  The Court should reject Lynk's attempt to graft a "directly" limitation into these phrases because it is unsupported by, and actually contradicts, the intrinsic record.

The specification confirms that the user can indirectly control the selection.  For example, the '479 patent discloses that "the switch" can be a dimmer switch of "any" type.  Ex. 4, '479 patent at Fig. 8, 14:4-34 ("The dimmer switch may be any known in the art, like for example, a phase dimmer switch."), claim 3 ("wherein the switch is a dimmer switch"), claim 11 ("wherein at least one of the first switch or the second switch is a dimmer switch").  The user interface for a dimmer switch often takes the form of a dial (knob) or sliding mechanism.  The dimmer switch contains integrated circuitry that "switches" or "open and closes" a circuit, thereby performing the function of adjusting the voltage supplied to the LED circuit.  *See* Section F, *supra*

15

(discussing plain and ordinary meaning of "switch").  Thus, while the circuitry switches the circuit, the user indirectly controls it via the user interface of a dial or slider, for example.

The prosecution history also confirms that the user can indirectly control the switch, including from a non-integrated user interface.  While prosecuting the '783 patent, the applicant sought to distinguish the claims over the prior art by requiring that 1) the switch be integrated into, and not separate from, the LED lighting device and 2) the switch be configured to enable user selection.[2]  Concerning the latter (user selection), the Examiner correctly understood the plain language of the pending claim "switch that is controlled by an end user" as encompassing switches that are indirectly controlled by a user.  Ex. 25, LYNK_HD_00003186 (indicating that a "lighting controller controls [sic] by a user" would meet a limitation reciting "switch that is controlled by an end user"); Ex. 19, LYNK_HD_00003159.  The Examiner also found that Mueller's (U.S. Patent No. 6,781,329) <u>remote</u> user interface 56 was a "switch that is controlled by an end user."  Ex. 25, LYNK_HD_00003184 ("56, user input").  Notably, Mueller relied on a processor-based controller to control the lights (i.e., indirect control by user).  *See generally* Ex. 20, HD_LYNK_00014655, HD_LYNK_00014664, HD_LYNK_00014659, at 3:48-54, 21:5-16, 12:14-45, 21:63-22:21, Figs. 2, 4A-4B, 6, 8.  The applicant did not disagree with the Examiner, and instead sought to distinguish Mueller by an amendment concerning the integrated nature and "physical" quality of the switch:  "a <u>physical</u> switch <u>integrated in a package that includes the at least one LED circuit.</u>"[3]  Ex. 26, LYNK_HD_00003246.

---

[2] Other claim limitations, such as the integration of the switch into the device, should not be conflated with the definition of this limitation, which is strictly about user control and selection of the switch.

[3] Notably, most of patentee's attempts to distinguish prior art centered on the "physical" (a qualifier that patentee later removed altogether from the claim language) and "integrated" nature of the switch.  *See* Ex. 26, LYNK_HD_00003239-42 (modifying claim 1 to require a "physical switch integrated in a package…, the physical switch being controlled by an end user" to



Ex. 20, HD_LYNK_00014634, HD_LYNK_00014641, at Figs. 1, 6 (remote user interface 56 annotated).

Similarly, while prosecuting the '479 patent, the applicant unsuccessfully tried to distinguish Shteynberg by amending the claim language to require "<u>wherein a color of light</u> . . . <u>is selectable by a switch controlled by a user</u>" and arguing that Shteynberg's switches are "[u]nder the control of the controller 120" and not "controlled by a user."  Ex. 17, LYNK_HD_00001303.  The Examiner unequivocally rejected applicant's argument, finding that Shteynberg taught "switch 110 is controlled by a user via interface 190 through controller 120." Ex. 28, LYNK_HD_00001326, LYNK_HD_00001328.  In short, the Examiner found that user selection or control of the switches could be indirect, e.g., through a controller.

---

overcome a rejection based on computer LED control); Ex. 27, LYNK_HD_00003398 ("*Van de Ven* instead discloses a dimmer switch . . . that is mounted on a wall, and separate from a lighting device" and "*Boone* discloses a separate dimmer switch."), LYNK_HD_00003393-96 (subsequently broadening the claim by replacing "physical switch being controlled by an end user" with "a switch configured to enable user selection").



Ex. 18, HD_LYNK_00014542, Fig. 1 (annotated).

The applicant then tried amending the claim and making the same argument again: "wherein a color of light . . . is <u>controlled</u> ~~selectable~~ by a switch <u>that is</u> controlled by <u>an end user</u>."  Ex. 29, LYNK_HD_00001350, LYNK_HD_00001357-58 ("Shteynberg does not disclose a switch that is controlled by an end user.").  The Examiner again rejected patentee's claims, this time applying Baddela (U.S. Patent No. 8,710,754).  Ex. 24, LYNK_HD_00001390 (finding that Baddela taught a dimmer switch controlled by an end user that controlled the color of light).  The Examiner cited "dimmer switch 704" in Baddela's Figure 7 as disclosing a switch that is controlled by an end user."  Ex. 24, LYNK_HD_00001390.



**FIG. 7**

Ex. 21, HD_LYNK_00014680, at Fig. 7 (annotated).  In response, the patentee cancelled the

claims.  Ex. 30, LYNK_HD_00001429.  Thus, the prosecution history thus confirms that these

limitations are not limited to "direct" control.

The ordinary meaning and intrinsic record confirm that the Court should reject Lynk's

attempt to read a "direct" limitation into these limitations.

**H.**     **"The switch is connected between the AC voltage power source and the LED lighting device" ('341 patent (claim 4))**

| Home Depot's Proposed Construction | Lynk's Proposed Construction |
|---|---|
| Indefinite | Plain & ordinary meaning |

Dependent claim 4 is indefinite because it is impossible for "the switch" to be part of a

"the LED lighting device" as required by independent claim 1 <u>and</u> be connected between that

"LED lighting device" and something else as required by dependent claim 4.  Specifically,

independent claim 1 recites an "LED lighting device comprising . . . a switch."  Ex. 3, '341

patent at 12:9, 18.  Yet, dependent claim 4 requires that that same switch be "connected *between*

the AC voltage power source *and the LED lighting device*."  *Id.* at 12:34-36 (emphasis added).

"A claim that is nonsensical or requires an impossibility is indefinite as a matter of law under §

112(b)." *Koki Holdings Co. v. Kyocera Senco Indus. Tools, Inc.*, No. CV 18-313-CFC, 2021 WL 1092579, at *1 (D. Del. Mar. 22, 2021).  Because claim 4 requires a "physical impossibility," it is "inherently unclear and cannot provide 'reasonable certainty about the scope of the invention.'"  *Id.* at *2 (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014)).

The '341 patent's "written description neither explains how this language describes a physical possibility nor offers an alternative meaning for the language."  *Id.* at *1.  As expected, the '341 patent fails to disclose any switch that is both part of an LED lighting device <u>and</u> between that LED lighting device and the power source.  For example, Figure 7 discloses a switch (60) that is connected between an LED device (50) and an AC power source, but switch (60) is not part of LED device (50).  Ex. 3, '341 patent at Fig. 7, 11:36-39.  Thus, claim 4 is invalid as indefinite.

I.    **"Forward voltage" '001 patent (claims 1, 6, 11, 16), "forward voltages" '341 Patent (Claim 3)**

| Home Depot's Proposed Construction | Lynk's Proposed Construction |
| --- | --- |
| "forward voltage" means "the minimum voltage difference required between the anode and cathode of the LEDs in the claimed circuit to allow current to flow through the LEDs"<br><br>"forward voltages" is indefinite ('341 Patent Claim 3) | Plain & ordinary meaning |

During prosecution of the '001 patent, the patentee defined "forward voltage" (singular) as follows:

> The "forward voltage" of an LED circuit, as recited in claim 1, is the minimum voltage difference required between the anode and cathode of the LEDs in the claimed circuit to allow current to flow through the LEDs.  (*See, e.g.*, LED Tutorial – Learn the basics, <u>https://www.baldengineer.com/led-basics.html</u>.)

Ex. 16, LYNK_HD_00002780.  This term should be construed according to that express definition.  *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) ("To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning" and must "clearly express an intent to redefine the term.") (quoting *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)).

While it is not necessary in light of the express definition, it should be noted that the express definition is consistent with the specification, which discloses "single voltage AC LED circuit(s)" that are each driven by a "predetermined forward voltage."  *See, e.g.*, Ex. 3, '341 patent at 4:5-11.  It is also consistent with the definition provided in the prior art cited in the intrinsic record and other case law.  *See* https://www.baldengineer.com/led-basics.html ("The forward voltage [singular] defines the amount of voltage required for the current to flow through the diode junction. . . . Current is allowed to flow through the LED once the voltage drop across it reaches the forward voltage."); *1 Energy Sols., Inc. v. Nicholas Holiday, Inc.*, No. CV13-5000-MWF (EX), 2014 WL 12589113, at *13 (C.D. Cal. July 9, 2014) (adopting parties' agreed construction of "forward voltage drop" as "the magnitude of voltage that must be applied across an LED to cause the LED to conduct").

The phrase "forward voltages" (plural) in the '341 patent occurs as part of the larger phrase "wherein the switching of the switch provides at least two different DC forward voltages to at least one of the first operating LED circuit or the at least one additional LED circuit."  Ex. 3, '341 patent at 12:30-33.  "Forward voltages" is indefinite because it is impossible for the "switching of the switch" to "provide at least two different DC forward voltages" to either LED circuit as claimed.  Under the controlling express definition of "forward voltage," an LED circuit

has a single forward voltage, i.e., the minimum voltage difference required to conduct current. Because each LED circuit has only a single forward voltage, no LED circuit can be provided with "at least two different DC forward voltages" as required by the claim.

The specification does not cure the indefiniteness in the plain language of claim 4. In fact, contrary to claim 4, the specification repeatedly emphasizes that each LED circuit has a "single voltage" and is driven by a "predetermined forward voltage" (e.g., 6 volts). *See* Ex. 3, '341 patent at 4:5-11. In reading the specification, care should be taken to distinguish between the "LED circuits" and the "LED device," which can comprise multiple single-voltage LED circuits. *Id.* at Fig. 3, 10:24-48. Within such an LED device, if the two LED circuits are connected in parallel, the forward voltage of the "LED device" is the same as each LED circuit (e.g., 6 volts). *Id.* at Fig. 4, 10:49-55. If the two LED circuits are connected in series, the forward voltage of the "LED device" is the sum of the forward voltages of the two LED circuits (e.g., 12 volts). *Id.* at Fig. 5, 10:56-64. Thus, the forward voltage of the LED device can be configured, but the forward voltage of each "single voltage" LED circuit is always the same (e.g., 6 volts).

The lack of support in the specification for claim 4 also dooms claim 4 as new matter. Claim 4 was added by amendment during prosecution. Ex. 22, LYNK_HD_00003992-LYNK_HD_00003995. Because the specification lacks any disclosure of the (indefinite) subject matter added by claim 4, claim 4 is invalid as impermissible new matter. *See* 35 U.S.C. §§ 112, 132.

J.      **"An LED circuit comprising two or more LEDs connected together in series to match a forward voltage drop of the mains AC power source" ('979 patent (claim 7))**

| Home Depot's Proposed Construction | Lynk's Proposed Construction |
|---|---|
| Indefinite<br><br>"matches" means "equals" | Plain & ordinary meaning |

This claim phrase is indefinite because the phrase "a forward voltage drop of the mains AC power source" is nonsensical—and a "claim that is nonsensical or requires an impossibility is indefinite as a matter of law." *Koki Holdings*, 2021 WL 1092579, at *1. A "forward voltage drop" is the voltage drop across a circuit, specifically, a diode like an LED or LED circuit. Neikirk Decl. at ¶ 37. In contrast to a diode, a mains AC power source does not have the concept of "forward" at all, much less a "forward voltage drop," because current does not flow across a mains AC power source in a single direction. Thus, referring to a "forward voltage drop" of an "mains AC power source" simply makes no sense to a POSTIA. *Id.* A mains AC power source is a source of power and supplies that power (voltage and/or current) to the rest of the circuit. *Id.* For example, a common "mains AC power source" is a standard wall outlet, which in the United States supplies 120V (rms) at 60Hz. There is no "forward voltage drop" of such as power source, so there is nothing that can be "matched" to that "forward voltage drop" as claimed. *Id.* Because claim 7 is nonsensical, the claim is "inherently unclear and cannot provide 'reasonable certainty about the scope of the invention.'" *Koki Holdings*, 2021 WL 1092579, at *2 (quoting *Nautilus*, 572 U.S. at 901). Thus, claim 7 is indefinite.

The term "match" should be construed to mean "equal," which is its ordinary meaning in this context. For example, the IEEE technical dictionary from 2000 defines "match" as "(A) A condition in which the values of corresponding components of two or more data items are **equal**"

and "(B) To compare two or more data items to determine whether their corresponding components are **equal** as in definition."). Ex. 23, HD_LYNK_00013548-51. This is the ordinary meaning of this term in the context of the patent to a POSITA. Neikirk Decl. at ¶ 38. There is no lexicography, disclaimer or any other basis in the intrinsic record that justifies changing the meaning of this term beyond its normally understood meaning.

The intrinsic record is consistent with this plain and ordinary meaning. Neikirk Decl. at ¶ 39. For example, the '979 patent's specification describes multiple embodiments having "at least two single voltage LED circuits" where "preferably each single voltage series LED circuit has a matching forward voltage of h6 VAC, 12 VAC, 24 VAC, 120 VAC, or other AC voltage levels [or DC depending on the embodiment] for each single voltage AC LED circuit." Ex. 6, '979 patent at 5:5-15. In other words, the specification uses the term "matching" consistent with its ordinary usage to convey that each of the at least two single voltage LED circuits would have <u>equal</u> forward voltages, from the set of, e.g., 6 VAC, 12 VAC, and so on. *See also id.* at 5:31-42 (same); 5:59-6-3 ("[e]ach single voltage LED circuit is designed to be driven with a predetermined forward voltage and preferably **<u>matching forward voltages for each circuit</u>** such as 12 VDC, 24 VDC, 120 VDC, or other DC voltage levels for each single voltage LED circuit."); 6:11-20 (similar, with AC values); and 6:28-40 (similar, with DC values).

The claims of the '979 patent similarly use "match" in the very same way. Neikirk Decl. at ¶ 39. For example, dependent claim 2 recites "2. The LED lighting device of claim 1, wherein the DC voltage output of the driver matches the AC voltage from the mains voltage power source." Ex. 6, '979 patent claim 2. Independent claim 1 already defines the relationship between the input and output voltages and how the driver converts one to the other. *Id.* at claim 1. Dependent claim 2 only adds the requirement that those voltages "match." *Id.* at claim 2.

Given that independent claim 1 already defines the other aspects of the relationship between the input and output, for dependent claim 2 to add anything it must mean that the voltages are equal. Ascribing any other meaning to "matches" would not make sense, and further would render the term superfluous. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claims.").

The related (and asserted) '251 patent also uses "match" in a manner consistent with its plain and ordinary meaning of "equals." For example, the '251 patent states:

> Regardless of whether rectifier 302 and LEDs 306 are integrated or mounted in a single package or are discretely packaged and connected, in order to drop higher voltages any number of LEDs may be connected in series or parallel in a device **to match** a desired voltage and light output. For example, in a lighting device that is run off of a 120 V source and contains LEDs having a forward operating voltage of 3V each connected to a bridge rectifier having diodes also having a forward operating voltage of 3V each, approximately 38 LEDs may be placed in series to drop the required voltage.

Ex. 8, '251 patent at 15:52-62. In this embodiment, the '251 patent describes a scenario in which the input power source of 120V is "matched" to the amount of voltage dropped in a lighting device utilizing a bridge rectifier and 38 series-connected LEDs. The amount of voltage dropped in such a device where each LED in the embodiment has a forward operating voltage of 3V is: (38 LEDs) x (3V) = 114V. The specification describes the bridge rectifier diodes also having a 3V forward operating voltage for each diode, so the two bridge rectifier diodes forward biased in a given half cycle impact the overall voltage drop by: (2 diodes) x (3V) = 6V. The overall voltage drop in that system is therefore 114V + 6V = 120V, which "matches" (i.e. is equal to) the 120V of the input AC power source. Neikirk Decl. at ¶ 39. This example in the specification further confirms that the patentee's use of "match" is consistent with its plain and ordinary meaning in this context of "equals."

For these reasons, the Court should construe "match" as meaning "equal," consistent with the term's plain and ordinary meaning in the context of the patent.

### K. "Either a rectified DC voltage Or a Rectified AC Voltage and wherein the second frequency of the output is a relatively higher frequency than the first frequency of the input" ('842 patent (claims 33, 38)) and "rectified AC voltage" ('551 patent (claims 1, 3, 4, 5))

| Home Depot's Proposed Construction | Lynk's Proposed Construction |
|---|---|
| Indefinite<br><br>"rectified AC voltage" means "a voltage output from a rectifier with a frequency"<br><br>"rectified DC voltage" means "a voltage output from a rectifier without a frequency" | Plain & ordinary meaning |

Claims 33 and 38 are indefinite because the output voltage cannot be "either a rectified DC voltage or a rectified AC voltage" and have a "second frequency" as claimed.  Neikirk Decl. at ¶ 40; *Koki Holdings*, 2021 WL 1092579, at *1 (a "claim that is nonsensical or requires an impossibility is indefinite as a matter of law.").

A POSITA would have understood that defining the output of the driver as "either a rectified DC voltage or a rectified AC voltage" means that the voltage output by the rectifier either has a frequency (rectified AC) or does not have a frequency (rectified DC).  The only occurrences of "rectified DC voltage" and "rectified AC voltage" in the '842 patent are in the patent claims.  Ex. 9, '842 patent claims 1, 13, 33, 38.  The same is true for the occurrences of "rectified AC voltage" in the '551 patent.  Ex. 7, '551 patent claims 1, 5, 27, 28, 29.  The terms "rectified DC voltage" and "rectified AC voltage" are presumed to have a different meaning as the terms are recited separately as alternatives: "wherein the second voltage is either a ***rectified DC voltage or a rectified AC voltage***."  Ex. 9, '842 patent at claims 33, 38 (emphasis added); *see PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 752 (Fed. Cir.

2016) ("the general assumption is that different terms have different meanings").  Given that the claims juxtapose "rectified DC voltage" and "rectified AC voltage" as alternatives, a POSITA would have understood "rectified AC voltage" to mean "a voltage output from a rectifier with a frequency" and "rectified DC voltage" to mean "a voltage output from a rectifier without a frequency."  There is no other reasonable basis for a POSITA to distinguish between these claimed alternatives.  Neikirk Decl. at ¶ 40.

However, claims 33 and 38 of the '842 patent also require that the output have a "second frequency." Ex. 9, '842 patent at 21:9-14, 21:40-22:5.  This directly contradicts the only reasonable meaning of "rectified DC voltage" in this context, rendering the claim impossible and indefinite.  Neikirk Decl. at ¶ 40; *Koki Holdings*, 2021 WL 1092579, at *1.  As the claim "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention," it is indefinite.  *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

Lynk failed to propose a construction of either "rectified DC voltage" or "rectified AC voltage" and failed to disclose any extrinsic evidence that could resolve the contradiction in the claims. Ex. 14, LYNK_HD_00005219 (*IEEE 100 The Authoritative Dictionary of IEEE Standards Terms* (7th Ed., 2000)); *IQASR LLC v. Wendt Corp*., 825 F. App'x 900, 907-08 (Fed. Cir. 2020) ("Showing that a skilled artisan cannot recognize the scope of a claim term with reasonable certainty requires showing considerably less uncertainty than showing that a skilled artisan could not understand the claim term.").  Accordingly, the Court should hold that the larger phrase in the '842 patent is indefinite, and that "rectified AC voltage" in the '551 patent means "a voltage output from a rectifier with a frequency."

**L.      "To dim the first LED circuit or the at least one additional LED circuit regardless of a user's selection via the switch" ('001 patent (claim 15))**

| Home Depot's Proposed Construction | Lynk's Proposed Construction |
|---|---|
| Indefinite | Plain & ordinary meaning |

A POSITA would not be reasonably certain about the scope of claim 15 given the contradictory claimed functions of the switches in claims 11 and 15. Neikirk Decl. at ¶ 41. Independent claim 11 requires a "switch" that turns at least one of the two LED circuits on or off. Ex. 2, '001 patent at 13:15, 20-23. Dependent claim 15 requires a "dimmer switch" that dims at least one of the two LED circuits "regardless" of the user's selection of "the switch," i.e., the on/off switch in claim 11. *Id.* at 14:1, 4-7. This limitation in claim 15 is nonsensical, because a dimmer switch cannot operate "regardless" of the user's selection of the on/off switch. A dimmer switch can only function for a particular LED circuit if the user has selected the first switch to be "on" for that particular LED circuit. Neikirk Decl. at ¶ 41; "A claim that is nonsensical or requires an impossibility is indefinite as a matter of law under § 112(b)." *Koki Holdings*, 2021 WL 1092579, at *1.

The '001 patent's "written description neither explains how this language describes a physical possibility nor offers an alternative meaning for the language." *Id*. at *1. The specification does not disclose a two-switch architecture at all, much less a two-switch architecture where a dimmer switch functions "regardless" of the on/off switch as required by claim 15. The specification only discloses single-switch embodiments that either 1) change brightness by adding or removing parallel LED circuits, or 2) change brightness by reducing the voltage output by the driver. Ex. 2, '001 patent at 11:36-3 (add LED circuits), 9:17-24 (reduce voltage). No embodiment includes two switches, much less two switches with the claimed "regardless" relationship. Neikirk Decl. at ¶ 42. Because this indefinite subject matter was

added during prosecution via an amendment (Ex. 16, LYNK_HD_00002777) claim 15 is also invalid as impermissible new matter.  *See* 35 U.S.C. §§ 112, 132.

## V.    CONCLUSION

For the foregoing reasons, HD respectfully requests that the Court adopt HD's proposed claim constructions and the parties' agreed claim constructions.

Dated:  October 6, 2021.                                 Respectfully,

*/s/ Jennifer Librach Nall*
Aaron G. Fountain
Texas Bar No. 24050619
Jennifer Librach Nall
Texas Bar No. 24061613
Brian K. Erickson
Texas Bar No. 24012594
**DLA PIPER LLP (US)**
303 Colorado St., Suite 3000
Austin, TX 78701-3799
Tel: 512.457.7000
Fax: 512.457.7001
aaron.fountain@dlapiper.com
jennifer.nall@us.dlapiper.com
brian.erickson@dlapiper.com

Nicholas G. Papastavros *(Pro Hac Vice)*
**DLA PIPER LLP (US)**
33 Arch Street, 26th Floor
Boston, MA 02110-1447
Telephone: 617.406.6000
Facsimile: 617.406.6119
nick.papastavros@dlapiper.com

***ATTORNEYS FOR DEFENDANTS
HOME DEPOT U.S.A. INC., THE HOME
DEPOT, INC. and HOME DEPOT PRODUCT
AUTHORITY, LLC***

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing document was forwarded via electronic

mail upon Plaintiff's counsel of record on October 6, 2021.

*/s/ Jennifer Librach Nall*
Jennifer Librach Nall
